Good morning. The first case on our call this morning is agenda number two, case number 99581. In re Rolandis G, a minor versus Rolandis G. Ms. Myers, are you ready to proceed? May it please the court. Counsel. My name is Leah Myers from the Illinois Attorney General's Office on behalf of the people of the state of Illinois. This case presents several issues connected to the seminal United States Supreme Court case of Crawford versus Washington. And although this case could be resolved on either harmless error or forfeiture by wrongdoing grounds, I'd like to begin my time and focus my time on the question of whether certain statements were testimonial and necessitating cross-examination under Crawford. In this case, the six-year-old victim, Vaughn, came home to tell his mother about abuse that he had suffered. The mother called the police, and police officer Robert Cure responded to the scene, and Vaughn made a second set of statements to him. About a week later, Vaughn was taken to a child advocacy center where he was interviewed by Jackie Weber, a child abuse advocate, and that interview was recorded. During the bench trial, which was before Crawford was issued, the state proceeded with these three sets of hearsay statements, which were admitted under Section 115.10 of the Code of Criminal Procedure, in that the mother testified, Officer Cure testified, and the videotape of the interview with Weber was played. Here, the parties are in substantial agreement about the status of many of these statements. The parties agree that the testimony by the mother constituted non-testimonial hearsay, so it was admissible under Section 115.10, and the parties agree that the statements to Officer Cure were testimonial and in violation of Crawford. The crux of the dispute, then, is over the status of the statements to Weber, the child abuse advocate. In 2007, this court in People v. Stetchley addressed a somewhat similar child abuse case with Crawford concerns. The three-justice plurality set forth a framework for evaluating whether statements are testimonial. Let me just interrupt you for one minute. Sure. What the child here, it was described by the judge as clammed up. It's a little different than Stetchley. What evidence do you have that was used in the trial concerning the unavailability of this witness? Well, because the parties proceeded under the assumption that the child was unavailable, and actually before this court, the parties do not dispute the unavailability of the child, so that is not an issue at this stage of the appeal. I think one of the special concurrences or dissents, Justice Gilbride, said that the mere unwillingness to testify cannot be the basis for the finding of unavailability. That's true. Although here, because Respondent has not disputed the admissibility of the statement to the mother under 11510, Respondent has not raised that issue, and so, therefore, it's not before this court. It's true that Stetchley did discuss that in that case, but because the parties aren't disputing it here, this court does not need to worry about that issue. And leaving that aside, what evidence of independent corroboration do you have that's required in this statute? The mother's testimony was not only to recount the hearsay that she heard, but also her observations of his strange behavior before he spoke, and his strange behavior of coughing, rinsing out his mouth, of not wanting to go back outside on a summer day, which was uncharacteristic, all matched up with the allegations that he later made, and certainly corroboration is not a high standard. It's simply something to further support the hearsay, and so, and again, the parties don't dispute that that was sufficient corroboration here. Ms. Myers, what about these factors, and how do they impact upon that statement? Defendant Swanberg arranged the interview, right? That's true. At the Carrie Lynn Center. Yes. The Carrie Lynn Center conducted all interviews for Rockford abuse victims, right? That is what Swanberg testified to. That's true. And even the website of Carrie Lynn expressly states that the center coordinates investigations and prosecutions of child abuse, right? That's one of the statements on the website, yes. And Swanberg was communicating with Weber during the interview via microphone or some apparatus, right? Actually, that is a point that we dispute. It is true she was wearing an earpiece. Respondent points to a moment in terms of the tape where respondent alleges that there was a male voice whispering. When I rewatched the tape at that moment and turned it up as high as my TVVCR could go, at best what I could hear was static. It was not clear that it was a male voice. And in addition, the two people in the observation room were a center employee as well as the police officer. So it's not clear who, if anybody, was communicating with Weber. It could have been the employee. No dispute, though, that Weber was a trained forensic interviewer. That was her title. Although, as the Connecticut Supreme Court in State v. Arroyo said, that does not automatically mean her main job was to get information for a future trial. And indeed, you've identified some of the ways in which the police were connected to this interview. However, the people put forth that it should be a totality of the circumstances test. And in both this Arroyo case from Connecticut and in State v. Bobadilla, the Minnesota Supreme Court noted that just interaction and communication with police should not be sufficient to render a statement to a child abuse advocate testimonial because that in and of itself has a dual purpose. Well, when you add to the factors that I've just indicated and the facts in this case, which I've indicated, and include that there isn't any dispute, is there, that the interview that took place between the worker and the victim in this particular case only related to what the respondent did, right? There weren't questions relating to the well-being generally of the victim, were there? No, but it's true that that doesn't mean that there couldn't have been a purpose to help the victim. At that time, the juvenile petition had not been filed, so it makes sense that they were trying to determine what happened. And what happened is relevant both to whether or not a case will go forward but also to what kinds of services down the road might need to be provided. Because the record is silent about what other types of treatment might have been provided, this Court should not simply presume that nothing occurred. Okay. Well, I've listed a number of factors that arguably would point toward it being testimonial. What factors on the other side are there? If we look to Weber as an individual, we know what she said at the beginning of the taped statement, which is that she introduced herself to Vaughn as being someone whose job it is to make sure children are safe. She said nothing about police. She said nothing about judges or getting someone into trouble or punishing someone. She said it is her job to keep kids safe, which shows a child welfare concern. We also know that the Cary Lynn Center website, in addition to that phrase about investigation. There was a policeman present at the time, though, right? But outside the room, yes. He was observing through a one-way mirror. That's true. But the police officer was never referenced. He was never seen. So it was not something that Vaughn would have, we should presume, have been aware of at the time. Is there evidence in the record that this interview was titled a forensic interview in the paperwork? I don't think that paperwork is in the record. It is unclear. And because of the fact that this trial happened before Crawford, there was no need to document that type of information. Certainly a remand for exploration of these issues could happen. However, we do have more information about Weber. In addition to what she said on the tape, we know the Cary Lynn Center, on its website, does acknowledge investigation and prosecution, but every other sentence, all the other content of the website addresses child welfare. In fact, it says, quote, the main goal of the center is to help reduce trauma by improving the efficiency of the systems that respond to cases of child abuse. Now, this directly references the fact that there's a multidisciplinary approach in Illinois to responding to child abuse cases. And, yes, the police and prosecutors have a role, but other people involved, such as child advocates, to ensure that the way in which the process goes forward is minimally traumatic for the child. So just because the police are present on this team shouldn't mean that they dominate everyone else on the team. Instead, the center's role was to worry about the child's welfare during the process. And because the question is, what was Weber's perspective when questioning Vaughn, certainly the focus is on her intent, her primary purpose in conducting that interview. Looking at the case- In that regard, you are espousing totality of the circumstances, but you want to consider both her intent and the declarant's intent, is that correct? That's correct, yes, in an objective manner. And it's important to consider, so that's true, looking at the declarant's intent, certainly we would support the three justice pluralities position of looking at a reasonable child, not a reasonable adult, within the declarant's perspective as being the appropriate stance, because the weight of the authority supports this. And as this Court can see through the amicus brief filed in support of the people here and the appendices that were also filed, there is empirically a great difference between what a young child understands about the criminal justice system and what an adult understands. And to say, what would a reasonable six-year-old child be intending when talking to Weber in this interview, certainly that factor in the totality of the circumstances heavily weighs in favor of finding it to be non-testimonial, because there is simply no evidence in the record that Vaughn would have been, or a reasonable six-year-old child, would have been making a statement in anticipation of its use at a trial. And certainly also, again, looking at the Cary Lynn Center's website, we know their concern was for child welfare. We also know the Center was accredited by the National Children's Alliance, which is an accrediting national organization that requires ten tenants to give accreditation status to a particular center. And of these ten tenants, their focus also is on child welfare. And when they note forensic interviews, it is not simply to view them as a way of getting information for police, but instead says that they need to be neutral in investigations or, excuse me, interviews, and also that one purpose is that they need to be coordinated in order to make sure that second and third interviews don't have to happen down the road. And that is why sharing information with police, in and of itself, is a mixed factor. Because, yes, the advocate knows the police may use that statement for a future prosecution, but they also want to share that information so that the police do not have to reinterrogate the child at a future date, because those future interviews might not take place in a child-friendly environment. They might not take place by a person who's trained to appropriately interview a child. And because of the fact that this information sharing has a mixed purpose, it certainly should not overwhelm what we do know about Weber as an individual, about her job and her training and her employer, which all show a primary purpose of child welfare. Respondent cites other factors in support of the assertion that Weber should be viewed as a police agent, but these are actually irrelevant to determining the purpose. She cites the fact that the interview took place in a question-and-answer format, but this in and of itself tells us nothing about what the purpose of the interview would be. A person can ask questions to get answers, but the question really is, what are those answers going to be used for? Are they going to be used to figure out how to best protect the child's welfare, or are those answers going to be used to develop a case for a future prosecution? Therefore, the format of the interview in and of itself tells us nothing about the purpose of the interview. And secondly, respondent cites the fact that there was no ongoing emergency and the fact that past events were discussed. These factors certainly reference back to the case of Davis v. Washington from the United States Supreme Court, which were two consolidated cases that both involved police questioners. Now, the holding in that case was that if objective circumstances indicate the primary purpose of the police questioner was to get answers to help resolve an ongoing emergency, then that's non-testimonial hearsay, whereas if the objective circumstances indicate the police officer was asking questions about past events, that that would be testimonial statements. Now, the United States Supreme Court prefaced this holding by saying, we don't mean to say that this standard applies to non-police statements, because in fact those two elements don't readily transport themselves into a non-police situation. Yes, a police officer wants to help a victim during an emergency, but as soon as the emergency has passed, then he'll resume his duties of investigating crime and promoting a future prosecution. In contrast, a child advocate such as Weber is never dispatched to the scene of emergency. She's never going to be there while an ongoing emergency still exists, so she's always going to be discussing past events. That mere fact tells us nothing about the purpose of the interview. The question, again, is what are those past events, what is that information going to be used for? Is it going to be used to determine how to protect the child's welfare, or are the past events going to be used to develop a case for trial? And certainly this court could look to both the Arroyo case from the Connecticut Supreme Court and the Bobadilla case from Minnesota, because in both of these cases, those Supreme Courts rejected this type of interaction and communication with police as being sufficient to render a statement testimonial, because of this dual purpose behind that communication in the absence of stronger or other factors. For example, many of the cases that respondent cites were child abuse statements were decided to be testimonial. In those cases, there was more dominant police roles. Perhaps in one case, the advocate testified that the purpose of the interview was to get information for the police. In another case, during the interview, the advocate said, you need to answer this question for me because the police are watching and the police need this information. And in other cases, the police met with the advocate both before and after the interview to shape the course of the interview. We have none of that here. We simply have passive observance by the police officer. And in contrast, in the Bobadilla case, in that case, the police officer was sitting in the room at the time of the interview, and the interview took place at a place that was called the Law Enforcement Center, which is certainly a more obvious situation of police involvement. And yet the Minnesota Supreme Court there found that statement to be non-testimonial. So again, it really is a sort of totality of the circumstances test. And because what we know about the six-year-old victim's intent, primary purpose in making the statement, does not at all support a finding of testimonial hearsay. And because what we know about Weber as the questioner, as an individual, her training, her job, her employer, the accrediting body of her employer, all supports a finding that she primarily was worried about the child's welfare. And, yes, there was communication with the police, but there is no evidence in the record that the police were controlling that interview, were having a more notable presence that Vaughn would have been aware of during the interview. Ms. Myers, you're discussing how interviews would take place, and isn't the format very important? Well, this Court did note in Stackley that formality is a factor to consider. But nothing about this particular interview was overly formal. But you discussed that this interview particularly was a question-and-answer situation with a child of six years of age. That's true. But wouldn't it be more helpful or less testimonial if it was in a play therapy situation, and it wasn't just a question-and-answer? That factor would more heavily support a finding of non-testimonial. But it should be remembered that this was not sort of a station house interrogation type question-and-answer situation. It took place in a room that was like a playroom. It had a cartoon poster on the wall. The table and chairs were child-sized. It was a person who had no kind of outfit or other showing of authority in the way she was dressed or in her manner. She used techniques that were often used by child advocates in terms of making sure, does the child know his colors, his numbers, talked about the family. It was very informal in that sense that it had more of a conversation to it. It was not simply sort of an adult enforcing a station house-like interrogation. So it is a little more complex than question-and-answer tells you one thing and a playroom would tell you another. This is sort of in the middle ground. And that is why it actually does not lend much support to finding a testimonial statement here. Ms. Meyer, in light of your reference to Stackley, it probably doesn't come as any surprise to you that I'd like to hear the forfeiture by wrongdoing. Sure. Yes, sure. I'd like to preface it very quickly by saying perhaps this Court should wait until the United States Supreme Court decides Giles v. California, which is expected in June, to address whether intent to silence is required in forfeiture by wrongdoing. It is true that Stackley held with four to two vote that intent to silence is an element here. That plurality referenced that perhaps murder is a case in dicta in which it could be presumed that intent is present. And certainly by analogy, the high incidence of post-traumatic stress disorder, of difficulties with child abuse victims, similarly shows a reasonable foreseeable causal connection between abuse and the inability of the child to testify later. But even if this Court doesn't want to presume intent under these circumstances, we do have facts here to support that finding. We have the fact that the interaction between the two began with the threat of hitting Vaughn with a stick. We have the fact that this is an 11-year-old child, much older, speaking to a younger 6-year-old child and pressuring him not to tell. This is forfeiture by wrongdoing. In Crawford, the Court specifically spoke to that issue, and yet you didn't raise it in the appellate court or in supplemental briefing. Is that right? That's correct. We raised it for the first time in our briefing here. And you were given that, and the supplemental briefing was given, I guess, after Crawford. Yes, that's correct. You were given that opportunity, but still it wasn't raised there. That's true. Why should we not consider that forfeiture? This Court should excuse forfeiture because under its rationale of excusing forfeiture in order to promote the uniformity of precedent, because of the fact in cases such as In re E H and others, this Court has repeatedly stated that constitutional questions should be reached as a last resort. And so both harmless error and forfeiture would obviate the need to reach the Crawford question. The constitutional question should be looked to as a last resort. Why shouldn't 115-10 dispose of this case? Because the parties do not dispute the facts. You guys didn't do that, considering the wrestling match we got into. Well, that's true, although because the parties agree that the mother's testimony is admissible here, that's what raises the harmless error question. If the parties agree that that evidence was properly admitted, then whatever this Court decides was improperly admitted, whether it's only the officer's statement or also the videotape, this Court would initially have to decide whether any error was harmless error before reaching the constitutional question. That's certainly in this Court's ability in its case law, excusing forfeiture for uniformity of precedent grounds. And because I know I'm about to run out of time, I'd just briefly like to point to the briefs and the five corroborating factors supporting a finding of harmlessness in the mother's testimony. And on that basis, the people would ask that this Court reverse the appellate court. Thank you. Thank you, Ms. Myers. Ms. Bowdy. Good morning, Your Honors. The State focuses primarily on general policy considerations concerning child advocacy centers. Those policy considerations are irrelevant in this case because Weber was not acting consistent with those policy considerations when she interviewed Vaughn. She was acting on behalf of the police to gather information pertinent to the investigation and prosecution of Herlandez. If Weber's purpose of the interview was to protect Vaughn's general well-being, then presumably she would have asked him questions related to his mental and physical health. She didn't even ask him how he felt. Would your argument be different if there was no police officer present, even though he was behind the glass? With the argument, if the police officer is present behind the glass certainly is a factor that weighs in favor of finding that the statement is testimonial. It's also important to keep in mind that the officer didn't play a passive role in this case. The officer was the one who initiated the interview. The officer conferred with Weber during the interview. And this is very evident from the video. If you watch the video, Weber at one point during the interview pauses and listens to a male voice and then starts asking Vaughn questions about a different topic. The officer also was involved in the decision-making process as to when the interview should end. The officer inventoried as police evidence a copy of the videotape of the interview as well as the diagram that was used during this interview. So the officer was not a mere passive observer as the state claims. The police played a very intimate role in this interview. In the presence of the respondent? Well, the respondent, in the presence of the respondent, in the presence of the Did the officer enter the room? The officer did not enter the room, but Vaughn knew that the police were involved in this case because once he told his mother about it, the police got involved and the police questioned him at his home about the incident. The level of police involvement isn't the only factor that weighs in favor of finding that the statement is testimonial. The interview was a very formal one. I mean, it occurred in an interview room, interview room number two, not a playroom as a state claims. Additionally, the statement was elicited in a question-and-answer format, and the statement was recorded. There was no ongoing emergency when the interview occurred. It occurred one week after the incident. And we can't discount Weber's role as a forensic interviewer. In this regard, there is evidence in the record that she was conducting a forensic interview. It's on page 17 of my brief. C30 of the record says that she was conducting a forensic interview and that she was a forensic interviewer. These objective circumstances make clear that Weber was acting on behalf of the police when she questioned Vaughn, and she did so to gather information relevant to the investigation and prosecution of Rolandis. Because of that, Vaughn's age is irrelevant. That's what this court held in Stekley. When the interviewer is acting on behalf of the police to gather information relevant to a criminal prosecution, the declarant's age is irrelevant. The objective circumstances of this case present an even clearer example of a testimonial statement produced through police interrogation than the factors in Stekley. I mean, at least in Stekley, the interviewer was a nurse. She interviewed the victim after the victim was brought to the hospital, and she brought the victim to the emergency room after the interview to be examined by a doctor. None of that occurred here. The only purpose of this interview was to gather information relevant to the investigation and prosecution of Rolandis. And there's no doubt that some statements by child abuse victims to child advocacy centers will be deemed testimonial. But that should not foreclose prosecution of these types of cases. The solution to Crawford is not to manipulate the term testimonial. The solution to Crawford is to be resourceful in meeting the requirement for cross-examination. I'd like to move on to the state's forfeiture argument, an argument the state raised for the first time in its briefs before this court. It never raised it in the appellate court or in its PLA to this court. The state urges this court to presume that Rolandis intended to cause Vaughn's unavailability at trial simply because a young child is often reluctant to testify. But in this court, in Stekley, this court declined to presume intent, and it held that a defendant does not forfeit his important right to confrontation unless he acts with the intent to procure the witness's unavailability at trial. And there's simply no evidence that Rolandis acted with that requisite intent in this case. That Rolandis allegedly threatened Vaughn with a stick is irrelevant because he threatened him with a stick to force him to submit to the sexual act, not to prevent him from testifying against him. The most the state can come up with is this supposed pinky swear between these two boys. But that's not evidence that Rolandis acted with the intent to prevent Vaughn from testifying against him. At most, it's a mere agreement between two boys not to tell. Before we deprive a defendant... Are you saying that we can't take into account the fact that there was a threat even related to the act rather than, I know that there's this pinky finger afterwards, right? Right. Not by itself, you would say, well, where's the threat? But the threat with respect to the act, can we take into consideration the fact that it's an 11-year-old versus a 6-year-old in this situation, that there's a traumatic experience here? Rolandis turned 11 two weeks before this incident. And the threat is irrelevant. The state hasn't cited a single case showing that the threat to force someone to commit the sexual act is relevant to or indicative of proof that the defendant acted with the intent to prevent the witness from testifying. I mean, the intent was to make him commit the act, not to prevent him from coming to court and testifying against him. So that threat is irrelevant. As I said, the only thing the state can come up with is this pinky swear. But before we deprive someone of his important right to confrontation, we need more than a pinky swear. Furthermore, if this court follows the causal connection test, there's absolutely no evidence in this record that Vaughn's unavailability was caused by Rolandis. When Vaughn started testifying on direct examination, the prosecutor asked him, are you scared? And Vaughn said, no. His unavailability is at most due to his embarrassment. I mean, you look at the video, and you can see that Vaughn was not traumatized with this incident. He had no qualms about talking about the incident. His only problem was in uttering certain words, and it embarrassed him. And so he would only say them if he could whisper them to Weber. So imagine how he felt coming into court and having to say certain things in front of a judge and in front of a prosecutor and in front of a defense attorney and in front of his mother. Maybe he was embarrassed about what happened, and he didn't want his mother to know about his prior sexual activity with his friend, Jr. Just briefly, I just want to, before I forget, on the waiver argument with respect to forfeiture by wrongdoing, it's not so much that they didn't raise it in their briefs in the appellate court, right? Because they were the appellees in the appellate court. Right. But they also didn't raise it in the PLA before. Right. This is the first time the state ever mentioned the forfeiture by wrongdoing doctrine. And at the very least, I think that shows that the state before didn't think that Rolandis had forfeited his right to confrontation. Counsel, on the question of forfeiture by wrongdoing, do you agree with the state that we should wait for the U.S. Supreme Court's ruling in Giles or Giles? I don't think Giles will necessarily resolve this issue because Giles involves a murder case. And as this court held in Stuckley, murder cases are very different from assault cases. In murder cases, the person knows that the witness isn't going to testify against him. And in an assault case, the witness may or the witness may not testify against him. So I think they're totally different contexts, and I don't think Giles will necessarily resolve this issue. I think this court can resolve this issue by looking at the facts of this case and finding that Rolandis has not forfeited his right to confrontation. Now, in Stuckley, this court ordered a hearing, a forfeiture hearing, because there was some evidence in the record to support the state's forfeiture argument. Specifically, M.M. claimed that the defendant told her that he would harm her if she told anyone, and a psychologist testified that M.M. was scared and that she couldn't testify. Before a court can remand for a forfeiture hearing, there needs to be some evidence in the record to support the forfeiture argument. Otherwise, a defendant could lose his right to confrontation based on a witness's claim six years after the fact that he was scared to testify against the defendant. We need some reasonable basis to support the claim in the record, and here there's absolutely no evidence in the record. Rolandis' conduct did not cause Vaughn's unavailability. And because there's no evidence to support the state's forfeiture argument, this court can dismiss the state's forfeiture argument out of hand. As stated in the briefs, the admission of the inadmissible statements was not harmless beyond a reasonable doubt. Therefore, this court should order a new trial and affirm the appellate court's judgment. Thank you, Ms. Fowdy. Rebuttal, Ms. Meyer. Yes, thank you. I'd like to make several points in rebuttal. First, concerning the testimonial analysis here. The fact that the interview by Weber mostly discussed what happened should not be determinative of the fact that no treatment was being envisioned by Weber. Before any treatment could be provided or a plan could be made, it is necessary to determine what exactly happened. The fact that past events are discussed does not show that there's no treatment motivation behind Weber's questioning. And in fact, the Connecticut Supreme Court in the Arroyo case held as much that a forensic interviewer first discusses past events, but that can be for the purpose of determining how to address the child's welfare, not simply to develop a case for trial. And this Arroyo case is an important precedent for this court to consider because in that case, the police retained an audio tape immediately afterwards. In that case, the police were observing on the other side of a one-way mirror. And yet, in that case, the Connecticut Supreme Court found this presence of police to be insufficient to render the statement testimonial. And that is what we have here. We have the police watching outside the window, but we have no evidence that Vaughn was aware that the police were involved during that interview. And that's the question. During the interview with Weber, what did Vaughn know? What did the questioner intend? Yes, the police were involved the week before, but the question is what happened at this interview at the time. Certainly, the respondent keeps insisting that under Stoeckley, the declarence intent is not relevant. The first point is that only three justices supported this way of analyzing testimonial hearsay, number one. And number two, that presumes without proving that Weber should be considered a police agent. Weber was not employed by the Rockford Police Department. She was employed by a separate nonprofit body. She was conducting the interview separately from the police. The police were not there. Although respondent insists that a male voice can be heard on the videotape, objectively, as an officer of the court, I listened to the tape again, turned it up as loud as I could, and I could not identify a male voice. Certainly, this court can listen to the tape and make its own judgment, but should not presume that there was indeed a male voice, meaning the police officer, feeding questions to Weber at the time. And that shows that, and compared to the Stoeckley case, the nurse wrote, testified, that the reason the interview was taking place with the police watching outside that one-way mirror was for the benefit of police. That's an important distinguishing factor. We do not have that same kind of factor in this case. And finally, then, turning to the forfeiture by wrongdoing issue, certainly the threat with the stick should be considered. The people did provide authority that this should be considered. On page 18 of the reply brief, we cited the West Virginia Supreme Court case of State v. Metchling. In that case, it was a domestic violence case, but the West Virginia Supreme Court acknowledged that the prior interaction between the husband and wife, actually it might have been a boyfriend and girlfriend, prior threats and prior physical harm is certainly relevant to what that person is thinking at that specific moment after the specific abuse in question. And so certainly the dynamics of the relationship are a relevant factor to consider. And, yes, respondent tries to dismiss this. Ms. Meyers? Yes. Can you give me an example of where, under your standard, where a four-, five-, six-year-old declarant would have objectively acted to a substantial degree to produce a statement for a future trial? In a talk with a child advocate specifically? Yes. Well, yes. Any hypothetical situation you choose. There is a case that I found, and I wish I could remember the specific case site, where the child marched up to the mother and said, we need to call the police because so-and-so did this to me. The person objectively showed her knowledge of the police. Was that child the same age, right? I believe it was a younger child. I believe it was a five-year-old, and I can check that specific site and supplement to the court. But if there is any evidence that that child is aware of the police and is aware of prosecution as an important factor, that would be different. We don't have that here. The word police was never mentioned during the entire interview between Weber and Vaughn. They simply were talking about what happened in order to determine what child services to provide. Ms. Meyers? Yes. If the facts of this case are sufficient to find forfeiture by wrongdoing, is there any logical limit to the application of that doctrine? Well, I think a broad forfeiture by wrongdoing is an important balance with a broad notion of testimonial hearsay, since that is the standard that Crawford set forth. It is documented in scholastic articles that in abuse cases, domestic violence and child abuse cases, there is often a causal link between the trauma suffered from the abuse and the inability to testify. Since Crawford hinges everything on cross-examination and testimony, certainly it is important to explore whether the wrongdoing caused that person's inability to testify at trial. It's true the record could be better here since this occurred before Crawford. All that opposing counsel does is sort of speculate as to why he may or may not have been able to testify at trial. This Court shouldn't speculate one way or the other. What we do know are the facts of the interaction. And this Court shouldn't hesitate to have a broad forfeiture by wrongdoing case because in the name, forfeiture by wrongdoing, a defendant should not benefit if his wrongdoing gives him the kind of reward or benefit of not being able to have this hearsay testimony come in when that person is unavailable to testify because of that wrongdoing. It's an equitable principle that goes back to the 19th century and has been acknowledged in both Davis and Crawford as being relevant in this area. And certainly, Giles, while it is a murder case, it is potentially relevant here because if intent to silence is not required, that will inform this case, even if it's an abuse case. And at the very least, since it's due in three months, it isn't that much of a wait to see whether or not Giles will be helpful in that regard. And finally, as to whether or not the people forfeited both this forfeiture and this harmless error issue, even besides the issue of excusing forfeiture, this Court and its supervisory authority certainly has the power to go ahead and address these issues. And because of the importance of Crawford here, it is important that this Court take its opportunity to provide guidance to the lower courts in Illinois. And by looking at harmlessness and forfeiture first before the Crawford issue, that's what we're going to expect the lower courts to do in future cases. And so certainly, this would be a good candidate for this Court to use its supervisory authority to get to those issues despite the forfeiture. And if there's no further questions, again, the people would ask that the appellate court be reversed, and if necessary, there be a remand for further investigation. Thank you. Thank you, Ms. Myers, and thank you, Ms. Boddy. Case number 99581, Enri Rolandes G v. Rolandes G, is taken under advisement as Agenda Number 2.